UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 21 CR 390 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| EFRAIN LEONIDES-SEGURIA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Efrain Leonides-Seguria, a citizen of Mexico, is charged by information with unlawful reentry into the United States in violation of 8 U.S.C. § 1326. Docs. 12, 17, 21. He moves to dismiss the charge, arguing that § 1326 is unconstitutional because it was enacted with a discriminatory purpose in violation of the equal protection component of the Fifth Amendment's Due Process Clause. Doc. 35.

Section 1326(a) makes it a felony for an "alien" (the term used in the statute) to enter, attempt to enter, or be found in the United States after previous exclusion or removal from the country. The statute was enacted in 1952 as part of the Immigration and Nationality Act ("INA"), Pub. L. No. 82-414, 66 Stat. 163. It replaced a predecessor statute, enacted in 1929, which had made it a felony to enter the United States after a previous removal. Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 1, 45 Stat. 1551. Leonides-Seguria contends that the 1929 law, though facially neutral, was enacted with discriminatory animus, and he further contends that the same animus motivated the enactment of § 1326. Doc. 35 at 14-15. He claims that § 1326 is discriminatory as to both race (against those with Hispanic lineages) and national origin (against Mexican citizens), *id*. at 8 n.2, though for ease of exposition the court will sometimes frame the

1

claim only in terms of racial discrimination. *See Majeske v. City of Chicago*, 218 F.3d 816, 819 n.1 (7th Cir. 2000) (doing the same given that race and national origin classifications receive the same level of equal protection scrutiny).

The parties disagree as to the standard governing Leonides-Seguria's equal protection challenge. Doc. 35 at 10-14; Doc. 36 at 12-18. Facially neutral laws challenged as motivated by a racially discriminatory purpose are generally subject to heightened judicial scrutiny. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). The Supreme Court has long recognized, however, that the power to exclude foreign nationals is a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (internal quotation marks omitted). Because Leonides-Seguria's challenge fails under either standard, the court assumes in his favor that the more rigorous *Arlington Heights* standard applies.

"The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013). A facially neutral law that yields racially disproportionate effects violates equal protection only if it was enacted with a "racially discriminatory intent or purpose." *Arlington Heights*, 429 U.S. at 265; *see also Washington v. Davis*, 426 U.S. 229, 239-41 (1976). This means that such a law violates equal protection only if the enacting legislature "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *see also Luft v. Evers*, 963 F.3d 665, 670 (7th Cir. 2020) ("Racial discrimination, as a constitutional matter, occurs only when a public official intends to hold a person's race against him.").

2

*Arlington Heights* supplies the framework for determining whether a facially neutral law violates equal protection. The initial burden rests on the law's challenger to show that "a discriminatory purpose" was "a motivating factor" in the law's enactment. *Arlington Heights*, 429 U.S. at 266. If the challenger makes that showing, the burden shifts to the law's defender to show that the law would have been enacted "even had the impermissible purpose not been considered." *Id*. at 270 n.21 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)); *see also Hunter v. Underwood*, 471 U.S. 222, 225 (1985). If the law's defender makes that showing, the law survives equal protection scrutiny, as "the complaining party … no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose." *Arlington Heights*, 429 U.S. at 270 n.21.

A law's "historical background" is relevant to discerning the enacting legislature's intentions. *Houlihan v. City of Chicago*, 871 F.3d 540, 553 (7th Cir. 2017) (quoting *Arlington Heights*, 429 U.S. at 267). That said, a court must not allow evidence of "past discrimination" to alter "[t]he allocation of the burden of proof." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *see also City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful."). Accordingly, a court must discern the intentions behind the most recent enactment of a challenged provision, not that of a prior tainted version. *See Hayden v. Paterson*, 594 F.3d 150, 165-67 (2d Cir. 2010) (holding that the race-neutral reenactment of a state constitution's felon disenfranchisement provision erased the discriminatory taint of earlier enactments); *Johnson v. Governor*, 405 F.3d 1214, 1224 (11th Cir. 2005) (en banc) (similar).

To carry his initial burden under *Arlington Heights*, Leonides-Seguria presents evidence that § 1326's predecessor statute was enacted with discriminatory animus. Doc. 35 at 14-35.

3

Specifically, Leonides-Seguria argues that the 1929 law targeted Mexican immigrants with a "bait and switch": workers were induced to travel illegally to the United States to provide inexpensive labor for American businesses (the bait), while the illegal reentry provision criminalized the laborers' border crossings (the switch). *Id*. at 7-8. The Government offers minimal pushback to the contention that the 1929 law was passed with discriminatory animus, Doc. 36 at 27-28, and the court assumes that it was.

Leonides-Seguria further contends that the 1929 law's discriminatory intentions were carried forward in Congress's enactment of § 1326 some two decades later as part of the INA. In support, he points to a lack of congressional debate on § 1326 during Congress's consideration of the INA. Doc. 35 at 33. He also points to evidence that, in his view, shows that 1952 lawmakers intended to continue the "bait and switch" of Mexican immigrants. First, just months before it enacted § 1326, Congress passed a separate bill that made it unlawful under certain circumstances to facilitate the entry of noncitizens into the country, Pub. L. No. 82-283, 66 Stat. 26 (1952), a bill to which some members of Congress referred as the "Wetback Bill." Doc. 35 at 24; Doc. 36 at 21. Second, a 1951 letter from the Attorney General to the Senate Judiciary Committee discussed whether Congress should criminalize being "found in"—not just the act of entering—the United States unlawfully, and the letter used the slur "wetback" when quoting a report from a presidential commission on migratory labor. Doc. 35 at 28; Doc. 35-16 at 7, 9. Third, in vetoing the INA, President Truman wrote that the bill "would perpetuate injustices of long standing" and "intensify the repressive and inhumane aspects of our immigration procedures." Doc. 35 at 27; Doc. 35-15 at 3. (Congress overrode the veto two days later. Doc. 35 at 27.) Leonides-Seguria contends that the "Wetback Bill" and § 1326 furthered the

"bait and switch" enshrined in the 1929 law, and that the use of racial slurs and President Truman's veto statement evince Congress's discriminatory intentions. *Id*. at 24-27.

The evidence cited by Leonides-Seguria—particularly the jarring use of the slur "wetback" on the floor of Congress and in the Attorney General's letter—reflects a climate in the early 1950s that generally was hostile to Mexican immigrants. Whether Leonides-Seguria has satisfied his burden under *Arlington Heights* of showing that anti-Mexican sentiment motivated the enactment of § 1326 is a somewhat different question, one that has yielded conflicting answers in cases considering equal protection challenges to the provision. *Compare United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996, 1011-17 (D. Nev. 2021) (holding that the same evidence establishes that § 1326 was enacted with discriminatory motivations), *with United States v. Viveros-Chavez*, 2022 WL 2116598, at *6-9 (N.D. Ill. June 13, 2022) (reaching the opposite conclusion), *and United States v. Calvillo-Diaz*, 2022 WL 1607525, at *7-10 (N.D. Ill. May 20, 2022) (same, explaining that "President Truman's veto … does not demonstrate that Congress enacted § 1326 due to a discriminatory motive" because his veto statement concerned the INA's nationality quota system, not § 1326).

Ultimately, the court need not decide whether, for purposes of the first part of the *Arlington Heights* analysis, the evidence establishes that anti-Mexican animus was a motivating factor in § 1326's enactment. The reason is that, for purposes of the second part of the *Arlington Heights* analysis, the evidence shows that Congress would have enacted the statute in 1952 even absent any discriminatory motivation.

In 1947, the Senate asked the Senate Judiciary Committee to "make a full and complete investigation of our entire immigration system" and to return a report with its findings. Doc. 36-1 at 9. The Committee's report recommended a comprehensive overhaul of the nation's

immigration and naturalization laws. Relevant here, the report noted that the 1929 criminal reentry statute had been underenforced due to overcrowded prisons and because violators were commonly deported even if not prosecuted. *Id*. at 7. The report accordingly advised against enhancing the statute's criminal penalties, suggesting that doing so would not result in increased prosecutions. *Ibid*. The report also observed that not one, but two, existing provisions criminalized illegal reentry. *Ibid*. The 1929 statute made illegal reentry a felony, imposing a statutory maximum of two years imprisonment and a fine of not more than $1,000, *Carrillo-Lopez*, 555 F. Supp. 3d at 1004 n.9, while another statute governed illegal reentry after removal for conduct relating to prostitution or "other immoral purposes" and provided for the same maximum prison term but no fine, Act of Feb. 5, 1917, Pub. L. No. 64-301, § 4, 39 Stat. 874. The report recommended consolidating the two provisions into one section and imposing uniform maximum punishments. Doc. 36-1 at 8.

The Judiciary Committee's report evidences a careful and deliberate review of the 1929 law, along with race- and national origin-neutral recommendations for reenacting a criminal unlawful reentry statute. Congress's enactment of § 1326 as part of the INA followed the Committee's recommendations, providing a single criminal reentry provision with the same penalties as the 1929 statute. That Congress followed the Committee's recommendations, which were presented in a race- and national original-neutral manner, is strong evidence that the law would have been passed even absent discriminatory animus toward Mexican immigrants.

Other evidence comes from a competing immigration bill put forth by members of Congress who opposed the INA as unduly restrictive. In introducing that bill in the Senate, its sponsors decried the "racial discrimination" against inhabitants of Asian and Caribbean nations reflected in the national origin quota system set forth in the bill that would become the INA. 98

6

Cong. Rec. 2141-42 (1952). Yet despite that concern, the competing bill included a provision identical to what would become § 1326. S. 2842, 82d Cong. § 276 (1952). True enough, it is possible that the competing bill's supporters harbored animus toward persons from Mexico or with Hispanic lineages but not persons from Asian or Caribbean nations. But the far more reasonable inference is that even those senators concerned with eliminating racial discrimination from the immigration laws saw fit to criminalize unlawful reentry—providing another strong indication that § 1326 would have passed even absent discriminatory animus.

Given this evidence, the court concludes that Congress would have enacted § 1326 as part of the INA regardless of any discriminatory motivations. It follows that the provision does not violate the equal protection guarantee of the Fifth Amendment's Due Process Clause. *See Arlington Heights*, 429 U.S. at 270 n.21; *Johnson*, 405 F.3d at 1224 (rejecting an equal protection challenge under *Arlington Heights* because the challenged provision would have been enacted "even without an impermissible motive"); *Calvillo-Diaz*, 2022 WL 1607525, at *11 (holding that Congress would have enacted § 1326 even absent discriminatory animus).

Although the analysis could stop here, two additional matters bear mention. First, the criminalization of unlawful entry is the norm among nations. A report prepared by the Law Library of Congress identifies 162 countries that punish unlawful entry, with 124—including Botswana, Chile, Denmark, Finland, France, Honduras, Jamaica, and South Korea—criminalizing the act. Law Library of Congress, Criminalization of Illegal Entry Around the World 1-30 (Aug. 2019). Leonides-Seguria argues that the court should not consider such laws because other nations differ from the United States both socially and politically. Doc. 43 at 6-7. That objection misses the point, which is simply that the criminalization of unlawful entry—and reentry, by implication—is a highly typical national policy, making it less likely that it emerged

7

in the United States due to discriminatory animus towards persons of any particular race or national origin.

Second, § 1326 has been amended five times since its 1952 enactment, to enhance its deterrent value, and there is no indication that the Congresses that enacted those amendments were motivated by racial animus. *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7345, 102 Stat. 4181 (increasing the maximum prison term for violators with previous felony convictions); Immigration Act of 1990, Pub. L. No. 101-649, § 543, 104 Stat. 4978 (increasing the maximum fine); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001, 108 Stat. 1796 (increasing the maximum prison term for violators having certain misdemeanor convictions); Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 441, 110 Stat. 1214 (limiting collateral attacks on removal orders in § 1326 prosecutions); Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, § 241, 110 Stat. 3009; *see also Carrillo-Lopez*, 555 F. Supp. 3d at 1005 ("Section 1326 was … amended in 1988, 1990, 1994, and 1996, always to increase its deterrent value."). Congress's repeated implicit reapproval of § 1326 via amendment shows—particularly given the imposition of penalties more severe than those established in 1952—that lawmakers not motivated by discriminatory animus favored criminalizing illegal reentry, providing further support for the proposition that § 1326 would have been enacted even absent such animus. *See Calvillo-Diaz*, 2022 WL 1607525, at *11 (reaching the same conclusion).

In sum, § 1326 does not violate equal protection, and Leonides-Seguria's motion to dismiss accordingly is denied.

September 12, 2022

United States District Judge